Hammons v. Renfrow.

---

HAMMONS v. RENFROW *et al.*, *Administrators*, *Plaintiffs in error.*

1. **Probate Court:** JURISDICTION. Where the husband in his life time received from the wife money, being the proceeds of the sale of her realty, with the understanding that he was to loan it out for the use and benefit of her sons by a former marriage, the probate court has jurisdiction to allow in favor of the sons a demand for such money against the estate of the husband. And this is true whether the demand be regarded as a legal or equitable one.

2. **Husband and Wife:** CONTRACTS BETWEEN: EQUITY. An agreement between a husband and wife, whereby the former receives her personal property to hold and manage as her trustee or agent, or for her minor children, is binding upon him in equity.

3. **Parties, Defect of:** WAIVER. Objections because of defect of parties must be seasonably made, or they will be deemed waived. They come too late in a motion for a new trial.

*Error to Moniteau Circuit Court.*—Hon. E. L. Edwards, Judge.

Affirmed.

*Draffen & Williams* and *Moore & Williams* for plaintiffs in error.

(1) The circuit court tried the cause and rendered its judgment on the theory that the proceeding was an equitable one. The probate court had no equitable jurisdiction. *Walker v. Walker*, 25 Mo. 367; *Butler v. Lawson*, 72 Mo. 244; *First Baptist Church v. Robertson*, 71 Mo. 326. (2) Plaintiff had no valid claim against the estate. The money, as soon as it came into the possession of the wife, became the individual property of the husband. Schouler's Dom. Relations, §§ 80-84; *Walker's Adm'r v. Walker*, 25 Mo. 375; *Tillman v. Tillman*, 50 Mo. 40; *Woodford v. Stephens*, 51 Mo. 443; *Kidwell v. Kirkpatrick*, 70 Mo. 214; *Spencer v. Vance*, 57 Mo. 427. Tyler on Infan. and Cov., p. 361. (3) There is not sufficient legal evidence to establish a trust against Renfrow. Loose conversations cannot be construed into a promise. *Woodford v. Stephens, supra*; *Kay v. Wilson*, 64 Mo. 493; *Lane v. Ewing*, 31 Mo. 75. The parties are dead and their declarations should be clear and unquestionable to create a trust. *Ringo v. Richardson*, 53 Mo. 385; 1 Greenl. Ev., secs. 45 and 200.

*L. F. Wood* and *Smith & Krauthoff* for defendant in error.

(1) The receipt of plaintiff and his brother was not binding on them, they being minors, and besides a receipt is not evidence of a conclusive character. (2) Plaintiff is the only person entitled to any part of the fund; the evidence being clear that the money was to be paid to plaintiff's mother's children, her "boys," when they became twenty-one years of age. Plaintiff is the only one who arrived at that age, the others having died childless while yet minors. (3) The sale of the farm at the request of Renfrow and the reception of the money from his wife is a sufficient consideration to support the agreement made

by Renfrow to loan the money for the use of his wife's children, and pay it over to them when they became of age. *Walker v. Walker*, 25 Mo. 374; *Lawson v. Lawson*, 46 Mo. 82; *Denings v. Williams*, 26 Conn. 226; *Morisson, adm'r, v. Morisson*, 4 Met. 84; *Haber v. Haber*, 10 Ohio 371; 2 Story's Eq. (12th Ed.) sec. 1380. (4) It was not necessary for plaintiff to seek his remedy in equity. The demand was really a legal one for money had and received. *Lockwood v. Kelsea*, 41 N. H. 185; *Roberts v. Mosely*, 51 Mo. 282; *Bair v. Cubbage*, 52 Mo. 404; 2 Story's Eq., sec. 843; *Insurance Co. v. Roulet*, 24 Wend. 505; *Rogers v. Daniell*, 8 Allen 343; *Fanelly v. Ladd*, 10 Allen 127; 1 Chitty Pl. (16 Am. Ed.) p. *362, note *j*; *Lathrop v. Bampton*, 31 Cal. 17; *Brown v. Lambert*, 33 Gratt. 256; *Oliver v. Piatt*, 3 How. 333; *Law v. Thorndike*, 20 Pick. 317; *Johnson v. Ames*, 11 Pick. 173; *Mills v. Post*, 70 Mo. 426; s. c. 7 Mo. App. 519; *Trecotheck v. Austin*, 4 Mason C. C. 29, 30. By the sixth section of the act establishing the probate court of Moniteau county, that court was invested with "exclusive original jurisdiction * * * to hear and determine all suits and other proceedings instituted against executors and administrators upon any demand against the estate of the testator or intestate, subject to appeal to the circuit court." (Acts of 1849, pp. 431, 432.) So that upon the facts of this case, the probate court alone had original jurisdiction of it. *Cones v. Ward*, 47 Mo. 289; *Dodson v. Scroggs*, 47 Mo. 287; *Titterington v. Hooker*, 58 Mo. 593; *Pearce v. Calhoun*, 59 Mo. 271; *Wernecke v. Kenyon*, 66 Mo. 283; *Ensworth v. Curd*, 68 Mo. 282; *Julian v. Ward*, 69 Mo. 153; *Wernse v. McPike*, 76 Mo. 249. The term demand is one of the most comprehensive in law. *Mayberry v. McClurg*, 51 Mo 256.

RAY, J.—This cause was begun in the probate court of Moniteau county in November, 1878, for the allowance of a demand against the estate of Mark Renfrow, de-

ceased, and was tried and determined upon the following amended account:

Estate of Mark Renfrow to Wm. H. Hammons, Dr.

To money received by Mark Renfrow in trust for William H. Hammons, Charles P. Hammons and Burtie Hammons, loan to W. Renfrow, April 3, 1867, at 10 per cent. compound interest ................................. $  960.00

Interest on same to February 19, 1876 ....... 778.00

$1,738.00

CREDITS.

February 19, 1876, by amount paid Wm. H. Hammons and Charles P. Hammons ....... $  536.18

$1,201.82

Interest to December, 1878 .................... 363.80

$1,565.62

On a trial in the probate court said account was allowed, in the sum of four hundred and eighty-three dollars, from which defendants appealed to the circuit court, where, upon a trial anew, the plaintiff had an allowance for the sum of $1,300, from which the cause is brought here by writ of error by the defendants.

The material facts appearing in evidence are, in substance, as follows: In 1866, Mark Renfrow, the deceased, married Mrs. Hammons, the mother of the plaintiff. At the date of the marriage Mrs. Hammons was a widow with three children, all boys: Wm. H., the plaintiff, Chas. E. and Asa Burt Hammons. There were, also, one half brother, and two half sisters, of the Hammons boys, the children of her first husband by a former marriage. Asa Burt Hammons died in the lifetime of his mother, and Charles after her death; both unmarried and without issue. The half brother, John C. Hammons, also died unmarried and without issue; the half sisters, Mrs. Graves and Mrs. Rector, are still living. At the

date of said marriage, said Renfrow also had children by a former marriage, and was possessed of a good property, and the plaintiff's mother then owned some personal property and also a farm of eighty acres in Cooper county, purchased out of the proceeds of her dower in her former husband's estate.    There was no ante-nuptial agreement between them, nor any issue of this marriage. Mrs. Chiles, the sister of Mrs. Renfrow, and aunt of the plaintiff, testified on behalf of plaintiff that some months after her marriage Mrs. Renfrow sold said tract of land, or farm in Cooper county to one David Shell, and received the purchase money herself; that she received it in her own hands, wrapped it up and said that it was for her little boys; that she was present when she made the sale and that she showed her the money, in her hands, and said "this is for my little boys."  This witness further said that on one occasion, in February, 1873, when Renfrow was going for the doctor, she heard her sister ask Renfrow what he was going to do about the money, and that she thought it ought to be made secure, and that Renfrow said that she need not be uneasy, that the boys should have the money; but he thought he ought to have the interest to pay doctors' bills.   This witness also said that Mark Renfrow loaned out this money, but she did not remember the names of the parties to whom it was loaned.   It does not appear by direct testimony precisely when the husband acquired the possession of this money from the wife, or what occurred between them, at the time, in reference thereto, if anything.

Brizindine, a witness for plaintiff, testified that after Mark Renfrow was married to Mrs. Hammons, plaintiff's mother, he desired to borrow some money and went to Mr. Renfrow to borrow it; he said he had some money, and said he had a note, drawn up for compound interest. "I told him I didn't want to borrow it and give such a note; then he told me the reason why he had the note drawn that way was because the money he proposed to loan belonged to the Hammons heirs, the children of his

wife by a former husband; in connection with this he said he was so particular because this was their money, and he wanted to let it out for their benefit that way; he said he had persuaded Lincy, his wife, it would be better to sell her land, and put out on interest, than to rent the place till they became of age. This was directly after the sale of his wife's land, as I understood it; this land was eighty acres she had bought in Cooper county, with money she had received from the sale of her dower interest in her former husband's land, and she was keeping it for her children; he said he had loaned money to James Renfrow, and had taken that kind of a note; he spoke of two amounts he had of that estate; can't say how much, but think he said he had loaned Renfrow between four hundred and six hundred dollars, and had four hundred dollars on hand; I couldn't be positive how much the place sold for, but have a slight recollection that it was $1,100." On cross examination, this witness further said that he only had one conversation with Mark Renfrow; it was some time before the death of his last wife; it was between 1870 and 1873; he didn't get the money from him; got it afterwards from Tom Renfrow, etc.

The record further shows that Renfrow, in loaning said money, took the notes payable to himself and secured by mortgage in his own name, and that he annually collected the interest thereon. There were two of said notes, one of date April 3, 1867, by J. P. Renfrow for five hundred dollars, at ten per cent., and the other by Thos. Pate, February 18, 1870, for five hundred dollars at ten per cent.

Pate testified, that in 1874 or 1875, after the death of Mrs. Renfrow and her son, Asa B. Hammons, the plaintiff, William Hammons, and his brother, Charles, went with him to see Renfrow about this money, when he made a payment of interest on said note, and that the following conversation and negotiations, in substance,

ensued : After he had paid the fifty dollars interest, Mark Renfrow said : "Boys, I will keep this fifty dollars interest and let you have the principal." William, the plaintiff, asked him if he didn't sell the Cooper county place for $1200, and he said yes, but there was a mortgage on it for two hundred dollars and twenty dollars interest, and twenty dollars taxes, leaving only nine hundred and sixty dollars ; either I or William asked Renfrow how this note of mine was to be transferred to them, and he said they must pay him eighty dollars, and then he would transfer it ; that William had bought a horse for fifty dollars, and had given an order for thirty dollars ; they were talking about his wife's land in Cooper county ; the boys claimed the nine hundred and sixty dollars ; the old man said he was going to keep the interest, and the balance of the money to pay for expenses ; that they had made a trip to Henry county which cost fifty dollars, and he had to buy tombstones and pay doctor's bills for his wife and her children.

Holt testified that he had a conversation with Mark Renfrow, in his lifetime, about borrowing some money, and that Renfrow, after speaking of the sale of his wife's land in Cooper county and the amount realized therefrom, said that his wife was sick two years and he had to pay her doctor's bills ; then John Hammons, her stepson, got sick and died, and he had his doctor's bills and expenses to pay ; then Burtie Hammons, her son, got hurt and died, and he had his doctor's bills and funeral expenses to pay, and so there was very little, if anything left for his part. John Hammons was about a grown man, and cooked for Renfrow the year before he died ; the other boys, William and Charles, stayed with Mr. Renfrow and worked like neighbors' boys, plowing, etc. There was other testimony, tending to show that the two oldest of the Hammons boys, Charles and William, were old enough to work and earned their living.

James P. Renfrow, a witness, testified : "Mark Renfrow was my uncle ; I borrowed five hundred dollars

of him, April 3, 1867, at ten per cent. simple interest, due in one year; I understood that it came from the sale of eighty acres of land that belonged to his wife, the mother of plaintiff, and that the land was sold for $1,200; I paid the last of this note on May 8, 1880, to the administrators; I had paid about six hundred dollars interest on the note; I paid over $1,300 in all."

The witness, Pate, whose testimony in chief is given above, and who is the father-in-law of the plaintiff, on his cross-examination, said: "In the conversation referred to, Renfrow said he should pay the boys the five hundred dollars, if they would give him a clear receipt in full of all demands against him; I think Renfrow transferred my note to the boys on March 8, 1876." Then it was, as we gather from the evidence, that the Hammons boys, who, as the evidence shows, were then minors, under twenty-one years of age, gave to Renfrow the following receipt, which was read in evidence at the trial:

"Received February 21, 1876, of Mark Renfrow, Sr., the sum of ($536.18) five hundred and thirty-six dollars and eighteen cents, in full of all claims or demands, whatsoever, which we have against him on account of our mother's property or effects.

"WILLIAM H. HAMMONS,
"CHARLES E. HAMMONS.

"Attest: H. H. HUDSON."

We have thus stated the testimony, at large, in order that we might have the facts of the whole case properly before us. It is here insisted by plaintiff in error, first, that the probate court had no jurisdiction of the cause; second, that by the law in force at the date of this transaction, the proceeds of the sale of the wife's land, so soon as they came to the hands of the wife, or those of the husband, became *eo instanti* the absolute property of the husband, and plaintiff has no title thereto or right of action therefor; third, that if it should be held that the husband's common law marital rights did

not attach to the proceeds of said sale by reason of what occurred between the husband and wife, at or about the time of its reception, then there is no evidence of an accomplished or perfected gift to the boys or children of the wife, and the proceeds remained the property of the wife, and at her death, her administrator alone was the proper party to sue; fourth, that in case it should be held that there was a perfected gift of said proceeds to the boys of the wife, or to the husband in trust for them, then, in that event, the title thereto vested, *in præsenti,* in the boys, and upon the death of plaintiff's brothers, Charles and Burtie, their interest therein would descend and vest in their next of kin, under the statute of descents and distribution; that there was, therefore, a defect of parties plaintiff to this action, and that the plaintiff, under the facts of this case, would only be entitled to a part thereof, and the said half-sisters of plaintiff and his deceased brothers to the balance, and that plaintiff's said recovery of the whole sum was manifest error. These positions of the plaintiff in error, we will consider in their order.

The first position of plaintiff in error, we think, under the facts and law of the case, is not well taken. The theory of this objection is that this action is in the nature of a "chancery proceeding," to enforce an alleged trust against said estate, upon the theory that the intestate acquired, held, and invested said property as a trustee for the wife's said children, etc. Section six of the act establishing the probate court of Moniteau county (Laws of 1849, page 432), if that act is to govern, provides that said court shall have exclusive original jurisdiction, among other things, "to hear and determine all suits and other proceedings, instituted against executors and administrators, upon *any demand* against the estate of the testator or intestate, subject to appeal in all cases, to the circuit court," etc. If the seventh section of the fourth article of 1 Wagner's Statutes, 1872, p. 440, is to govern, then it is provided thereby that the several county courts shall, when not otherwise provided by law, have

exclusive original jurisdiction, among other things "to hear and determine all suits and other proceedings, instituted against executors or administrators, upon *any demand* against the estate of their testator or intestate, when such demand shall not exceed one hundred dollars, and concurrent jurisdiction with the circuit court in all such cases, when the demand shall exceed that sum, subject to appeal, in all cases, to the circuit court, in such manner as may be provided by law."

These sections, or either of them, seem ample enough to confer jurisdiction upon the probate court, whatever may be the nature of the demand in this particular, whether equitable or legal. Such, we think, has been the current of adjudications in this state, upon questions of this sort. 47 Mo. 285 ; 47 Mo. 289 ; 58 Mo. 593 ; 59 Mo. 271 ; 66 Mo. 283 ; 68 Mo. 282 ; 69 Mo. 153 ; 76 Mo. 249. The case at bar is unlike and distinguishable from the case of *First Baptist Church v. Robinson,* 71 Mo. 326, and that of *Butler v. Lawson,* 72 Mo. 227. The plain and simple facts of this case do not, in our opinion, render them "matters of purely equitable cognizance," within the rule laid down in those cases and governable by the doctrines there expressed. Those cases, upon inspection, will be found to be widely different, in their scope and comprehension, from the simple account filed in this case as the basis of plaintiff's demand, or the evidence offered in support thereof. This case is, we think, more in the nature of an action at law, for money had and received on the part of the intestate, for the use and benefit of said children, than an action or bill in chancery, for matters of purely equitable cognizance, such as are contemplated in the 71st and 72d Mo. Repts., *supra.* 1 Story's Eq. Jur. (11th Ed.) sec. 60 ; 24 Wend. 505, 514 ; 41 N. H. 185, 187, *et seq.*, and cases cited ; R. S. 1879, sec. 3839 ; 2 Perry on Trusts, secs. 492, 843.

As to the second point, it may be conceded that the general doctrine as there stated may be true ; but while this is so, it is not denied but that a husband may, by

*clear and unequivocal* acts, so acquire the possession of his wife's personal property, and so hold and manage the same, as to exclude the same from his common law marital rights, and show that he took and held such possession, not for himself by virtue of his marital rights, but as trustee or agent for his wife, or for her minor children, as the case may be.  It is well settled in this state, we think, that in such case, while a contract between husband and wife for such purpose may not be valid at law, yet in equity it will be upheld, whenever the proof is sufficiently clear and convincing as to show, beyond question, that such was the distinct agreement and understanding of the husband and wife, in reference thereto.    To this effect there are no want of authorities. 2 Story's Eq. Jur. (12th Ed.) sec. 1380; 25 Mo. 367, 374, 375; 46 Mo. 82; 26 Conn. 226; 4 Met. (Ky.) 84; 10 Ohio 371.

In reference to the third point, it is sufficient for the present, at least, to say that evidence was not wanting tending to show very clearly, that the contemplated gift of the property to the wife's boys, was, by the acts and conduct of husband and wife in reference thereto, so far consummated, as to vest in them the right and title to the fund, upon attaining their majority.    Of this, however, we may have occasion to speak further hereafter.

As to the fourth and last point we deem necessary to notice, we will defer all discussion in reference thereto to a subsequent part of this opinion.

Returning, however, to the *second* and *third* points made by plaintiff in error, we think a glance at the testimony above set out shows very clearly, if not beyond question:    First, that, at the date of the marriage, between Renfrow and wife, she was seized in fee of the eighty acre farm in Cooper county; that shortly after the marriage the husband persuaded the wife that it would be better to sell her land and put the proceeds out at interest, than to rent the place till the boys, her children, became of age; that, at the sale, the husband, without

objection or protest, allowed the proceeds to be paid over to the wife; that she received it in her hands, wrapped it up, and said "this is for my little boys;" that, shortly thereafter, the husband, when applied to to borrow money, said he had some money and a note drawn up for compound interest; that when the applicant objected to giving such a note, the husband told him the reason why he had the note drawn that way was because the money he proposed to loan *belonged* to the Hammons heirs, the children of his wife by a former husband; in the same connection he further said he was so particular because it was *their money*, and he wanted to let it out for their benefit that way; that on another occasion in 1874 or 1875, when Pate went to Renfrow to pay the annual interest on his note, the plaintiff and his brother, Charles, accompanied him to see Renfrow about this money, and when Pate paid the fifty dollars interest, Renfrow said: "Boys, I will keep this fifty dollars interest and let you have the five hundred dollars principal," and on the same occasion, when asked how Pate's note should be transferred to the boys, Renfrow said they must pay him eighty dollars, and then he would transfer it; that plaintiff had bought a horse for fifty dollars and given an order for thirty dollars; in further conversation the boys claimed the nine hundred and sixty dollars, and the old man said he was going to keep the interest and the balance of the money to pay for expenses for trips to Henry county and for tombstones and doctor's bills for his wife and her children; and further on in that conversation, Renfrow said that he would pay the boys the $500, if they would give him a clear receipt in full of all demands against him; this witness also said that he thought Renfrow transferred his note to the boys in March, 1876; the receipt read in evidence shows that in February, 1876, Renfrow paid the boys, William and Charles, the sum of $536.18, in full of all claims or demands whatsoever, which they had against him on account of their mother's property or effects; that the

boys at the date of their settlement and receipt were still minors. The witness, Jas. P. Renfrow, said that Mark Renfrow was his uncle; that he borrowed of him five hundred dollars in April, 1867, at ten per cent. simple interest; that he understood that it came from the sale of the eighty acres of land that belonged to his wife, the mother of the plaintiff, that was sold for $1,200; that he paid the last of his note in May, 1880, to the administrator; that he had paid about $600 interest on the note, and in all over $1300. This is the amount of the allowance above set out.

In view of such testimony, and other evidence of a like character, tending to the same result, we are not prepared to say that the trial court (or if it is to be treated as a chancellor) was not warranted by the evidence in making the finding and rendering the judgment complained of, and we do not feel called upon, on that account, to reverse said judgment so appealed from. We think, therefore, that the second and third points made by plaintiffs in error are not well taken.

As to the fourth point, it is insisted for plaintiff that it is clearly shown by the testimony in the cause, as well as by the acts and conduct of the parties, that the agreement and understanding between the husband and wife in reference to the subject matter of this suit was, that the real estate of the wife should be converted into money and loaned out at interest for the use and benefit of the boys of the wife, to the exclusion of the husband, the half-sisters, and everybody else, until the boys should become twenty-one years of age; that the two youngest of the boys died in their minority, unmarried, and without issue, and that the plaintiff alone within the contemplation of the parties and their agreement in reference thereto, upon attaining his majority, was entitled to the whole fund, so set apart, for the boys of the wife. The facts were all before the court. The cause was submitted for trial without the intervention of a jury. No instructions or declarations of law were asked or given; nor

does it otherwise appear on what theory the case was tried. The court, as shown by the record, after hearing the testimony and argument of counsel, took the case under advisement, from the ninth to the eleventh of the month, and thereupon "being, in the matter, fully advised," found for the plaintiff in the sum of $1,300, and rendered judgment accordingly.

It is not shown by the record that the defendant, at any time, or in any manner, either before or during the progress of the trial, made any objection whatever that there was a defect of parties plaintiff, or otherwise, to said action. The tenor of all our adjudications is to the effect that all objections and exceptions must be seasonably and timely made and saved, otherwise they will be deemed to have been waived. The first time this objection appears on the record is in the motion of defendant for a new trial, and from aught that appears to the contrary said motion was for that reason overruled.

Under the circumstances, we are not prepared to hold that the trial court erred in so ruling, and its judgment is, therefore, affirmed. All concur.